UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Schmidt Printing, Inc.,

            Plaintiff,

v.                                                                   Civ. No. 10-1038 (JNE/TNL)
                                                                              ORDER

Pitney Bowes, Inc., individually and d/b/a
Pitney Bowes International Services,

            Defendant.

This case arises out of a declaratory action brought by Plaintiff Schmidt Printing, Inc. ("Schmidt"). Schmidt seeks a judgment that it does not owe Defendant Pitney Bowes, Inc. ("Pitney") $2,373,578.00 in postage costs arising from mailings sent through the Royal Mail, the national postal service for the United Kingdom. Pitney filed a breach of contract counterclaim based on a June 2006 written contract between its predecessor and Schmidt, asserting that Schmidt has a contractual obligation to pay for all postage expenses incurred on its account. Pitney now moves for summary judgment based on the 2006 contract, requesting that Schmidt's request for declaratory relief be denied and that judgment be granted as a matter of law on Pitney's breach of contract counterclaim. For the reasons stated below, the Court denies Pitney's motion.

## I.      BACKGROUND[1]

Schmidt is a printing company in Byron, Minnesota. From 1999 until February 2010, Schmidt printed marketing materials for Response Direct Publishing ("RDP"), a marketing company based in England that produced and mailed catalogues and card packs. These materials included advertisements sent to individuals living in the United Kingdom. Schmidt shipped the

---

[1] Unless otherwise stated, the facts described below are undisputed or are those that a reasonable fact-finder could find when viewing the record in the light most favorable to Schmidt.

1

materials to England, where they were then mailed to individuals through the Royal Mail. RDP (or RDP's mailing company, Packmail) processed the Schmidt-printed materials through an account with Schmidt's name on it. Each time a mailing was submitted to Royal Mail and processed through the "Schmidt" account, a docket or "posting cheque" was created. Each posting cheque was considered a mailing contract for postage. RDP had access to Schmidt's account and filled out all of the dockets—Schmidt played no role in this process.

Spring is a mailing company owned by the national post offices of the United Kingdom (Royal Mail), the Netherlands (TNT), and Singapore (Singapore Post). According to Schmidt, Spring and RDP negotiated a rebate agreement where Spring would pay RDP a portion of the commissions Spring earned from Royal Mail for mailings originating from the United States in the form of a rebate. This rebate allowed RDP to have lower costs than if it had printed the materials in the United Kingdom or elsewhere in Europe. In October 2004,[2] Schmidt and G3 Worldwide (Services) Inc. ("G3"), an affiliate of Spring, entered into an agreement ("2004 Agreement") to have G3 process and transport marketing materials in the United Kingdom. In 2006, G3 and Schmidt entered into the 2006 Processing and Transportation Services Agreement ("2006 Agreement"), which was substantially similar to the 2004 Agreement.[3] The 2006 Agreement states, in relevant part:

> Spring will invoice [Schmidt], after each mailing, for the costs of postage for the mailing. [Schmidt] will then invoice G3 Worldwide (US) Inc., or its designee, after it pays for the costs of postage for the mailing for the Services. . . . G3 Worldwide (US) Inc. will settle, or procure the settlement of, [Schmidt]'s

---

[2]   The first contract, dated July 20, 2004, was signed in September 2004. It was revised on October 1, 2004 and signed in November 2004.

[3]   The 2006 Agreement was entered into by G3 Worldwide (US) Inc. Sometime between 2004 and 2006, G3 Worldwide (Services) Inc. assigned its contracts to G3 Worldwide (US) Inc. The distinction between these two companies is irrelevant for purposes of this motion, and the Court refers to both as "G3."

invoice after receipt, on a quarterly basis, provided that [Schmidt] has paid all invoices issued to [Schmidt] by G3 Worldwide (US) Inc. (or by its parent company, any affiliate thereof and/or any third party on whose behalf Spring is acting) that are directly related to mailing(s) that [Schmidt] has invoiced the Services fee for. . . .

This Agreement is between G3 Worldwide (US) Inc. and [Schmidt] and does not create or amend any binding relationship between either party and any third party.

This Agreement represents the entire agreement between the parties in relation to the subject matter hereof and replaces all previous understandings, agreements and representations related to the subject matter hereof, including the [2004 Agreement]. . . . This Agreement will be subject to the laws of the State of New York.

On March 14, 2007, Pitney purchased certain assets from Spring, including the 2006 Agreement. On March 16, 2007, Schmidt expressly consented to Pitney's assumption of the Agreement. Also in 2007, Pitney executed an agency agreement with Royal Mail that allowed it to act as Royal Mail's sales agent for mail originating in the United States.

After RDP processed its mailings through the "Schmidt" account, Pitney paid the costs of postage to Royal Mail, and then invoiced both Schmidt and RDP for those costs. During the eleven years that Schmidt printed materials for RDP, only RDP paid invoices related to postage—Schmidt never paid for postage costs related to its RDP mailings. In 2009, RDP began experiencing financial problems and on February 3, 2010, RDP entered into administration (similar to bankruptcy proceedings). On February 5, 2010, Pitney notified Schmidt by letter that it owed $2,118,909.00 in unpaid postage.[4] Of that amount, $1,593,612.00 is related to mailings that did not originate with Schmidt, but were processed through Schmidt's account.[5]

---

[4] This amount has since been amended to include additional invoices—the total amount allegedly owed is $2,373,578.00.

[5] It is disputed whether Schmidt approved or had knowledge of these non-Schmidt mailings being processed through its account.

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Pitney asserts that there is no genuine dispute as to any material fact related to Pitney's breach of contract counterclaim. Under New York law, the elements of a breach of contract claim are: (1) the existence of an agreement; (2) the performance of the contract by plaintiff; (3) breach of the agreement by defendant; and (4) damages. *Advanced Mktg. Grp. v. Bus. Payment Sys.*, 300 F. App'x 48, 49 (2d Cir. 2008). It is undisputed that G3 and Schmidt entered into an agreement, Pitney has been assigned that agreement, Schmidt consented to that assignment, Schmidt received at least some postage invoices, and there are unpaid postage charges on the Schmidt account. However, the parties dispute whether the 2006 Agreement obligates Schmidt to pay postage and, if any such obligation exists, for which mailings Schmidt is obligated to pay. Pitney argues the contract is a postage contract and that the plain language clearly requires Schmidt to pay all postage costs on its account with Pitney. Schmidt argues that it is a rebate contract and that the plain language unambiguously does *not* create an obligation for it to pay for

any postage costs. Alternatively, Schmidt argues that summary judgment is inappropriate because the contract language is ambiguous with respect to the payment of postage costs. Schmidt also argues that the contract unambiguously does not obligate it to pay the postage for mailings that did not originate with Schmidt.

"Under New York law . . . the initial question for the court on a motion for summary judgment with respect to a contract claim is 'whether the contract is unambiguous with respect to the question disputed by the parties.'" *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). A contract is "ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). The court must "read the integrated agreement 'as a whole.'" *Id.* (citation omitted); *Law Debenture Trust Co. of N.Y.*, 595 F.3d at 467 (explaining that the court must read disputed clauses "in the context of the entire agreement"). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Lockheed Martin Corp.*, 639 F.3d at 69 (citation omitted). When a contract is unambiguous, a court may not consider extrinsic evidence, including evidence of the parties' post-contract conduct. *See id.* at 71. "However, where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder." *Id.* Summary judgment is generally inappropriate in such cases, unless the extrinsic evidence is "so one-sided that no reasonable person could decide to the contrary." *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114-15 (2d Cir. 2010).

The third paragraph of the 2006 Agreement provides:

> Spring will invoice [Schmidt], after each mailing, for the costs of postage for the mailing. [Schmidt] will then invoice G3 Worldwide (US) Inc., or its designee, after it pays for the costs of postage for the mailing for the Services. . . . G3 [] will settle, or procure the settlement of, [Schmidt]'s invoice after receipt, on a quarterly basis, provided that [Schmidt] has paid all invoices issued to [Schmidt] by G3 . . . that are directly related to mailing(s) that [Schmidt] has invoiced the Services fee for.

Pitney argues that this language unambiguously obligates Schmidt to pay for the costs of postage.[6] Schmidt argues that this language is merely a condition precedent to Pitney's obligation to pay Schmidt for the administration, handling, and freight services Schmidt provides under the contract. This Court does not read the words "after it pays" and "provided that [Schmidt] has paid" to create an unambiguous obligation for Schmidt to pay Pitney postage costs. The contract does not say that Schmidt *must* pay, *will* pay, or *promises* to pay. Pitney points to the language stating, "Spring will invoice [Schmidt], after each mailing, for the costs of postage for the mailing." It argues that in the business world, the word "invoice" implies that the recipient of that invoice is obligated to pay the invoice. This, however, is not clear from the contract language alone and there is no evidence that "invoice" necessarily conveys such a meaning. The language of the contract specifies that Pitney is not obligated to settle Schmidt's invoices until Schmidt has paid the postage—but it is unclear whether there is a contractual duty to pay postage or what should happen under this contract when postage is not paid. The Court cannot find as a matter of law that the words "after it pays" and "provided that [Schmidt] has paid" in this contract create an independent obligation.

There is no indication elsewhere in the contract that the contract was unambiguously intended to create a duty for Schmidt to pay postage. The 2006 Agreement is for "processing

---

[6]   Because of Pitney's assumption of the 2006 Agreement, Schmidt would pay Pitney, rather than Spring, for the postage costs.

and transportation services," consisting of "administration," "handling," and "contracted freight movement to the United Kingdom." It does not mention "postage." Schedule 1 of the 2006 Agreement, entitled "Fee Calculation," provides detailed explanations of how Schmidt's fees and bonuses are to be calculated, based upon Schmidt's actual costs, volume and weight of mail, and revenue production. While the contract contains extensive detail regarding Schmidt's fee structure, it does not contain essential terms or elements regarding postage costs. Therefore, reading the disputed contract clauses in the context of the entire agreement, it is not clear that the contract relates to obligations to pay postage costs.

However, the Court also declines to find that the contract unambiguously does *not* create such an obligation. When interpreting a contract, the Court "must strive to give meaning to every sentence, clause, and word." *N.Y. Marine & Gen. Ins. Co.*, 599 F.3d at 116 (internal quotation marks omitted). Much, if not all, of the 2006 Agreement relates to Pitney's obligation to pay Schmidt's invoices and how such payments are calculated, but Pitney does not have to perform under the contract unless Schmidt has first paid Pitney's postage invoices. Without an expectation that Schmidt will pay these postage invoices, the contract, and paragraph three in particular, does not make much sense. Further, the language "after it pays for the costs of postage" and "provided that [Schmidt] has paid all invoices" reasonably suggests that Schmidt has some obligation to pay the postage invoices. The Court cannot conclude as a matter of law that no obligation to pay postage exists under this contract.

Having found that the contract language is ambiguous regarding the payment of postage, the Court cannot resolve this ambiguity by turning to extrinsic evidence. This is generally a question reserved for the fact-finder. *JA Apparel Corp.*, 568 F.3d at 397. Here, there are simply too many genuine disputes of material fact and the undisputed facts are not so one-sided that the

7

court can resolve this dispute as a matter of law.[7] There are material disputes not only related to who is responsible for payment, but also for which mailings that party must pay. The parties' dispute is not appropriate for summary resolution.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Pitney's Motion for Summary Judgment [Docket No. 119] is DENIED.

Dated: November 29, 2011

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

---

[7] Schmidt also asks the Court to *sua sponte* grant partial summary judgment in its favor relating to the non-Schmidt-origin mailings. But the Court does not find that the contract unambiguously excludes these mailings, especially since it is disputed whether Schmidt approved of, knew about, should have known about, or is otherwise responsible for these non-Schmidt mailings being processed through its account.